IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

SHERRY V. SHAW,                    )
                                   )
    Plaintiff,             )
                                   )
v.                                 )          No. 11-2859-STA-tmp
                                   )
PATRICK R. DONAHOE, Postmaster     )
General, United States Postal      )
Service, et al.,                   )
                                   )
    Defendants.            )

---

## REPORT AND RECOMMENDATION

---

Before the court by order of reference are plaintiff Sherry V. Shaw's Motion for Summary Judgment (ECF No. 71) and defendant Postmaster General Patrick R. Donahoe's ("USPS") Motion for Summary Judgment (ECF No. 72). For the reasons below, it is recommended that the USPS's Motion for Summary Judgment be granted and that Shaw's Motion for Summary Judgment be denied.

### I.  PROPOSED FINDINGS OF FACT

#### A.  Procedural History

Sherry Shaw, who is a Baptist, is employed by the USPS. (ECF No. 72-1, Def.'s Statement of Material Facts ("DSMF") ¶ 6.) On September 29, 2011, she filed this lawsuit *pro se*, alleging religious discrimination, retaliation, hostile work environment, and various other federal and state law claims against the USPS,

American Postal Workers Union Memphis, Tennessee Area Local 96, and American Postal Workers Union AFL-CIO.[1] (ECF No. 1, Compl.) The claims against the unions were later dismissed with prejudice upon motion of the plaintiff; thus, USPS is the only remaining defendant. (ECF No. 66, Order Granting Pl.'s Unopposed Mot. to Dismiss With Prejudice.) Shaw's complaint stems from three separate administrative Equal Employment Opportunity ("EEO") complaints of discrimination that she filed against the USPS: Charge No. 4H-370-0108-08 filed on May 30, 2008, as amended in part ("Charge No. 08"); Charge No. 4H-370-0034-09 filed on January 14, 2009 ("Charge No. 09"); and Charge No. 4H-370-0100-10 filed on July 3, 2010 ("Charge No. 10"). (ECF No. 54, Third Am. Compl. ¶¶ 7-8.) In Charge No. 08, Shaw alleged that she was discriminated against based on her religion and retaliated against for prior EEO activity when she was denied opportunities to work overtime on her off days on various dates between May 7, 2008 and July 16, 2008; when she was required to work alone in an "unsafe environment" on various dates in May, June, and July 2008; when her Sunday work hours were changed on July 11, 2008; when she was denied changes to her work schedule for personal convenience on various dates between July 17,

---

[1]Originally, the complaint was brought by Shaw and a co-worker, Rochelle Johnson, based on separate allegations of discrimination. On September 10, 2012, the court severed the claims of Shaw and Johnson. The present case pertains solely to Shaw's claims.

2008 and November 23, 2008;[2] and when she was notified on October 23, 2008, that her position was being abolished. (DSMF ¶ 1; ECF No. 79, Pl.'s Statement of Material Facts in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s SMF in Opp'n") ¶ 1.)

In Charge No. 09, Shaw alleged discrimination based on her religion and retaliation for EEO activity when she was involuntarily reassigned from the USPS's Airport Station to the USPS's Memphis Processing and Distribution Center ("P&DC") on January 3, 2009, and when she was denied the opportunity for in-section bidding at the Airport Station from January 15 to 22, 2009.[3] (DSMF ¶ 2; Pl.'s SMF in Opp'n ¶ 2.) Shaw alleged in Charge No. 10 retaliation by the USPS when, on April 14, 2010, her retreat rights were denied; training that she was scheduled to receive was terminated on June 16, 2010; and her bid award was not properly processed by management on July 3, 2010. (DSMF ¶ 3; Pl.'s SMF in

_____

[2]Charge No. 08 alleges a date of December 26, 2008; however, the supporting documents show a date of November 23, 2008. (ECF No. 72-9.) This discrepancy is immaterial.

[3]In her response in opposition to the USPS's Motion for Summary Judgment, Shaw lists several other EEO charges of discrimination that she has filed against the USPS. (Pl.'s SMF in Opp'n ¶¶ 1-3.) However, the present lawsuit only includes allegations brought under the three specific EEO charges of discrimination identified in the Third Amended Complaint and upon which Shaw has timely filed her complaint. The court notes that in one of her other cases, this court dismissed Shaw's complaint as untimely, and the Court of Appeals affirmed. Shaw v. Donahoe, No. 11-cv-2232-STA, Order Granting Defendant's Motion to Dismiss, aff'd, Shaw v. Donahoe, No. 13-5336.

Opp'n ¶ 3.)  A hearing was held before an administrative judge, who dismissed all three complaints on April 6, 2011.

Count I of the Third Amended Complaint alleges that the USPS violated Title VII of the Civil Rights Act of 1964 by discriminating against her on the basis of her religion.[4]  Count II alleges that the USPS violated Title VII by retaliating against her for engaging in EEO protected activity.  Count III alleges a violation of the Labor Management Relations Act of 1947, in that the "USPS breached its contractual agreement with [American Postal Workers Union]"; "failed to investigate [Shaw's] claims of harassment/hostile work environment and discrimination"; and "witnessed and/or participated in falsifying documents to limit, segregate, and classify [Shaw] as the junior employee in her section."  Counts V and VI are state law claims against the USPS for intentional infliction of emotional distress and "intentional infliction of physical injury."[5]  Count VII is titled "Hostile Work Environment" and is based on the same allegations of discrimination and retaliation set forth in the complaint.

---

[4]Paragraph 52 of the complaint makes a single reference to sex discrimination.  This appears to be a typographical error, as Count I is titled "Religion Discrimination," Shaw's prior EEO charges only allege religious discrimination and retaliation, and the complaint contains no other references to sex discrimination.

[5]Count IV alleges claims that pertain only to the union defendants, who have since been dismissed from this lawsuit.

**B.   Material Facts**[6]

Shaw has worked for the USPS since 1986, and in November 2007, she began working at the USPS's Airport Station as a mail processing clerk.  (DSMF ¶ 4.)  Some of the clerks at the Airport Station had window duties, and some did not.  (DSMF ¶ 4.)  Shaw did not have window clerk duties.  (DSMF ¶ 4.)  The other clerks at the Airport Station who did not have window duties included Dexter Moragne, Dorothy Richardson, Rochelle Johnson, Wanda Jackson, Phyllis Baker, and Derek Ragland.  (DSMF ¶ 4.)  Shaw's chain of command at the Airport Station included Bertram Tate (the station manager) and Ave Williford (Shaw's supervisor).[7]  (DSMF ¶ 5.)

On February 5, 2008, Shaw asked for time off from work to participate as a representative on behalf of Rochelle Johnson, in an EEO conference in Charge No. 4H-370-142-06 brought by Johnson

---

[6]Set forth below are only those facts that the court finds to be material to the parties' cross-motions for summary judgment.  The court finds that Shaw asserts numerous statements of fact in her motion and response in opposition that are not supported by the documents Shaw cites.  To the extent that any of these asserted facts are arguably material, the court will address the lack of evidentiary support below.

[7]Shaw previously filed EEO complaints in 1996-1997, 2002, 2005, and 2006-2007, but according to the USPS, neither Tate nor Williford had any involvement in those cases.  (DSMF ¶ 7.)  Shaw contends that Tate and Williford were aware that she participated as a representative in cases filed by her co-workers at the Airport Station prior to her arrival at that location in November 2007. (Pl.'s SMF in Opp'n ¶ 7.)

against Tate.[8]  (ECF No. 71, Pl.'s Statement of Material Facts in Supp. of Pl.'s Mot. for Summ. J. ("PSMF") ¶ 1.)  Shaw's request for time off on February 5 was authorized by Williford.  (PSMF ¶ 1.)  Approximately three months later, on either May 5 or May 6, 2008, Tate called Shaw, as well as Johnson and Derek Ragland, to report to work for overtime on Tuesday, May 6, 2008.[9]  February 18, 2014 (PSMF ¶ 3; DSMF ¶ 8.)  Shaw informed Tate that it was not her turn to work overtime.  (DSMF ¶ 8; Shaw Dep. at 74.)  According to Shaw, she informed Tate that it was Ragland's turn for the Tuesday

---

[8]Although the USPS does not dispute that, at some point, Williford and Tate became aware of Shaw's role as Johnson's representative in Johnson's EEO case, the USPS disputes Shaw's claim that they became aware of Shaw's participation on February 5, 2008.  The USPS states there is no evidence in the record to support Shaw's statement that Williford and Tate were specifically told that Shaw needed to be off work on February 5, 2008, in order to participate in Johnson's EEO case.  The USPS states that neither Tate nor Williford attested to knowledge of Shaw's participation in Johnson's EEO case on that date.  (ECF No. 81-1, Def.'s Resp. to Pl.'s Statements of Material Fact in Supp. of her Mot. for Summ. J. ("Def.'s Resp. to Pl.'s SMF") ¶ 1.)  However, Shaw has submitted her affidavit in which she states that on February 5, 2008, she told Tate that she had to attend an EEO status conference with Johnson because she was Johnson's EEO representative, and that on the same day, Johnson conveyed to Shaw that she (Johnson) had previously given Williford a copy of an Order and Notice of Status Conference.  (ECF No. 84-1, July 5, 2013 Shaw Aff. ¶¶ 4-7.)  The USPS also does not dispute that Tate was aware that Shaw was an EEO Representative for Johnson during the administrative processing of Johnson's EEO complaints brought against Tate.  (ECF No. 71-1 at 4, Def.'s Supplemental Resps. to Pl.'s Req. for Admis. ¶ 4.)  Although this material fact is in dispute, for reasons stated in the Proposed Conclusions of Law, the USPS is entitled to summary judgment even assuming that Shaw's supervisors were aware of her EEO activity as of February 5, 2008.

[9]The parties dispute whether Johnson was called to work overtime.  This disputed fact is immaterial.

overtime rotation. (Pl.'s SMF in Opp'n ¶ 8.) Thereafter, Shaw claims that she was denied opportunities to work overtime on her scheduled days off: six Wednesday overtime shifts in favor of Phyllis Baker, and five Tuesday overtime shifts in favor of Ragland.[10] (PSMF ¶¶ 5, 6.) In support of this claim of denied overtime opportunities, Shaw cites to the EEO Investigative Summary of Charge No. 08. (ECF No. 83-1 at 22.) This single-page document appears to be a chart setting forth the overtime work assignments during the period from April 15 through July 30, 2008. This document apparently shows that of the employees at the Airport Station who did not perform window duties, three employees were eligible for overtime during this time period - Shaw, Baker, and Ragland. The document appears to show that Shaw worked overtime on May 13, July 23, and July 30; that Baker worked overtime on six dates; and that Ragland worked overtime on five dates. The court finds that this document does not support Shaw's claim that she was denied overtime opportunities during this time period, and that Shaw has not provided any evidence to demonstrate that she was entitled to overtime hours on any specific dates over Baker and Ragland, both of whom were senior to Shaw.

---

[10]Tate and Williford were not aware of any prior EEO activity by Baker and Ragland. (PSMF ¶ 8.) Shaw describes Baker and Ragland as "similarly situated employees." (PSMF ¶¶ 5, 6.) The court gives no weight to Shaw's legal conclusion that these employees were similarly situated.

Shaw subsequently removed her name from the Overtime Desired List on July 30, 2008. (DSMF ¶ 8; Pl.'s SMF in Opp'n ¶ 8; Shaw Dep. 146.) Shaw contends that she asked to be removed from the Overtime Desired List because Williford did not schedule an additional employee to work during the 3:00 a.m. overtime assignment. (Pl.'s SMF in Opp'n ¶ 8.)

Throughout her career at the USPS, Shaw has worked on Sundays, as Sunday was a regularly scheduled work day for her. (DSMF ¶ 6; Pl.'s SMF in Opp'n ¶¶ 6, 9; Shaw Dep. 27-28.) Prior to May 2008, Shaw and Phyllis Baker worked together on Sundays. (DSMF ¶ 9.) In May 2008, Baker went on approved maternity leave.[11] (DSMF ¶ 9.) While Baker was on leave, Shaw was scheduled to work on four consecutive Sundays (May 11, 2008 to June 1, 2008). (DSMF ¶ 9; Pl.'s SMF in Opp'n ¶ 9.) That schedule would have required Shaw to work for some hours alone.[12] (DSMF ¶ 9; Pl.'s SMF in Opp'n ¶ 9.)

---

[11]Shaw disputes that Baker was on maternity leave. (PSMF ¶ 9; Pl.'s SMF in Opp'n ¶ 9.) Shaw cites Baker's hearing testimony at page 99; however, this testimony shows that Baker was authorized to take time off from work because she had recently adopted a baby on May 4, 2008. (ECF No. 79-4 at 53.) It is immaterial the type of leave that Baker was approved to take.

[12]Shaw states in her response that "[p]rior to May 11, 2008, no employee was scheduled to work alone on Sundays and overtime assignments were made to accommodate this." (Pl.'s SMF in Opp'n ¶ 9.) Shaw cites Baker's hearing testimony at page 102; however, at most Baker's testimony indicates that prior to Shaw's arrival at the Airport Station, Baker worked with other employees on Sundays. (ECF 79-4 at 54.) Shaw also cites the hearing testimony of Michelle Jordan, the former Manager of Customer Service Operations in Memphis. (ECF No. 79-4 at 83.) The testimony cited by Shaw, however, does not involve Sunday work assignments. (ECF No. 79-4

On May 9 and 10, 2008, Shaw notified Tate and Williford that she had concerns about her safety while working alone on Sunday mornings. (PSMF ¶¶ 9, 10.) When Tate was made aware that Shaw was afraid to come into the building alone, Tate came in one Sunday so that Shaw would not be alone. (DSMF ¶ 9; Pl.'s SMF in Opp'n ¶ 9.) On another Sunday, he required another supervisor, Anne Spencer, to come to work with Shaw. (DSMF ¶ 9; Pl.'s SMF in Opp'n ¶ 9.) Thereafter, her bid hours were changed so that she would not have to work alone.[13] (DSMF ¶ 10; Shaw Dep. 144.) Shaw has provided no evidence to show that she ever, in fact, worked alone on any of these complained of dates.

Shaw has never made a request for an accommodation so that she could be off work on Sundays for mandatory religious observances. (DSMF ¶ 6; Pl.'s SMF in Opp'n ¶ 6; Shaw Dep. 27-28.) On July 17, 2008, September 22, 2008, and November 23, 2008, Shaw requested a personal change of schedule, requesting that her hours be changed, from 4:00 a.m. to 12:30 p.m. with Tuesdays and Wednesdays off, to 4:00 a.m. to 12:30 p.m. with Saturdays and Sundays off. (PSMF ¶ 14; DSMF ¶ 11; Pl.'s SMF in Opp'n ¶ 11; ECF No. 72-9, Req. For Temporary Schedule Change.) All three requests were denied, and the reason given for the denial was "needs of the service." (DSMF

at 86.)

[13]Shaw points out that her work hours were changed only after the EEO mediation of her Charge No. 08. (PSMF ¶ 13.)

¶ 11; PSMF ¶ 15; Req. For Temporary Schedule Change, ECF No. 72-9.)
Shaw asserts in her response to the USPS's motion that mail
processing clerks Jackson, Richardson, and Baker also held similar
bid positions at the Airport Station and that their non-mandatory
religious observations were accommodated by not having to work on
Sundays. (Pl.'s SMF in Opp'n ¶ 6.) The court finds that the
testimony cited by Shaw does not support this asserted fact.
Specifically, Shaw cites Richardson's April 5, 2011 testimony
before the administrative judge, pages 245 lines 23-25, and page
246 lines 1-6. The hearing transcript cited in and attached to
Shaw's motion actually appears not to be the hearing testimony of
Richardson, but instead that of Theresa Williams, who is another
clerk at the Airport Station. (ECF No. 79-4 at 91.) Moreover,
Williams was asked whether Tate asked her if she would work on
Sunday, to which Williams responded, "I don't recall if he did nor
not, but I wouldn't have worked on Sunday . . . I go to church on
Sunday. . . . Everybody there knows I go to church on Sunday."
(ECF No. 79-4 at 98-99.) This testimony does not support Shaw's
implication that other employees at the Airport Station asked for
and were given accommodations based on their religious beliefs.
Tate and Williford testified that they were unaware of the
religious practices of Richardson, Jackson, and Moragne. (PSMF ¶
72.)

Beginning in 2008, management of the USPS determined that mail volume was declining.[14] (DSMF ¶ 13.) Decisions were made to cut clerk positions at various facilities in Memphis, including the Airport Station. (DSMF ¶ 13.) According to the USPS, it was determined that Shaw had the least seniority among the clerks without window duties at the Airport Station, and therefore decided that she would be excessed and reassigned. (DSMF ¶ 15.) Shaw alleges, however, that she was not the most junior clerk in the entire Airport Station and that her transfer was improper.[15] (Pl.'s SMF in Opp'n ¶ 4.)

On October 23, 2008[16] and December 15, 2008, Shaw was given letters notifying her that her job was going to be excessed and she

_____

[14]Shaw disputes that mail volume had declined at the Airport Station facility. (PSMF ¶ 40; Pl.'s SMF in Opp'n ¶ 13.) However, the document Shaw cites does not support her contention nor create a disputed issue of fact. The Function 4 Review relied upon by Shaw at most indicates an increase in mail volume over a two-day period in September 2007, over a year before the decision was made to abolish her position. (ECF No. 79-6 at 4-5.)

[15]The parties vigorously dispute the issue of whether the USPS appropriately determined that the Airport Station was comprised of two sections instead of one, for purposes of determining which employee to excess based on seniority. Both parties have cited evidence that raises a genuine dispute of fact on this issue. However, the court finds that this dispute is immaterial, for reasons stated in the Proposed Conclusions of Law.

[16]On October 20, 2008, Tate and Williford were contacted by an EEO investigator to complete and submit affidavits in connection with Charge No. 08. (PSMF ¶ 20.) On October 22, the administrative judge set Shaw's settlement conference for October 24, 2008. (PSMF ¶ 21.) On October 23, 2008, Williford was provided a copy of Shaw's request for time off from work to address her EEO charge. (PSMF ¶ 22.)

would be reassigned to the P&DC, located at 555 South Third Street in downtown Memphis, effective January 3, 2009.[17] (PSMF ¶¶ 23-24, 43-44; DSMF ¶ 12; ECF No. 72-10, Letters from A. Williford to Shaw.) She was notified in that letter that she would retain the right to return to the Airport Station upon the first residual vacancy in the salary level after employees at the Airport Station completed bidding.[18] (DSMF ¶ 12.) According to Joseph Pegues, a Postal Service Labor Relations Specialist, "[a] job becomes residual if it is posted in a particular section and no one in that section bids on it." (ECF No. 72-12 ¶ 8.)

After Shaw was reassigned to the P&DC, there were no residual vacancies at the Airport Station. (DSMF ¶ 16; Shaw Dep. 172-73.) While Shaw does not dispute that there were no residual vacancies at the Airport Station, Shaw alleges that between January 2009 and

---

[17]Shaw asserts that after she was notified of the abolishment of her position at the Airport Station, but before her reassignment to the P&DC, another employee, TaJuana Simmons, was promoted, and implies that Simmons's promotion satisfied the USPS's need to reduce the number of clerks at Airport Station. (PSMF ¶¶ 28, 41-42; Pl.'s SMF in Opp'n ¶ 12.) The USPS disputes this fact and its relevance to the cross-motions for summary judgment. (Def.'s Resp. to Pl.'s SMF ¶¶ 28-29.) The court finds that this factual dispute is immaterial.

[18]Under the applicable Collective Bargaining Agreement, job vacancies are posted and bid on by persons interested in having the job. (DSMF ¶ 17.) The job is awarded to the person with the highest seniority. (DSMF ¶ 17.) Job postings include the days off. (DSMF ¶ 17.) Certain off days are more desirable than others, particularly Saturday and Sunday. (DSMF ¶ 17.)

May 2011, she requested a job transfer back to the Airport Station on multiple occasions:[19]

- Shaw states that on January 5, 2009, Williford and Tate "requested Labor Relations to revert Plaintiff's clerk position Job #95279878." (PSMF ¶ 45.) The relevance of this statement of fact is unclear, and she does not support this fact with any citation to the record. Although in her reply brief, Shaw cites to Defendant's Supplemental Responses to Request for Admissions 108-112 (ECF No. 73 at 31-32), these discovery responses do not support Shaw's statement of fact in Paragraph 45.

- She claims that on one occasion "there was an illegal in-section bid held at the Airport Station from January 15, 2009 through January 22, 2009, for Mail Processing Job #95363468 (occupied by Phyllis Baker)." (Pl.'s SMF in Opp'n ¶ 16; see also PSMF ¶¶ 46-47.) Shaw cites a memorandum dated January 12, 2009 and the bid documentation for that position. (ECF Nos. 79-9, -10.) However, these documents only demonstrate that Shaw attempted to invoke retreat rights to the position and that Baker bid for that position, and do not support any allegation of "illegality" of that bidding process.

---

[19]The court notes that many of these events were not detailed in her EEO charges or occurred after the filing of Charge No. 10. The court is not inclined to consider these events as a basis for liability. Nevertheless, for the sake of completeness, the court will address these events.

- Shaw alleges impropriety in connection with a "Newly Established Position" at Airport Station on February 12-13, 2009. (PSMF ¶ 49; Pl.'s SMF in Opp'n ¶ 16.) Shaw provides no explanation as to why this bidding process was improper, nor does she cite any evidence in the record to support this contention.

- In August 2009, clerk position #95115693 was posted for bidding, and Shaw invoked her retreat rights by bidding for the position.[20] (ECF No. 72-14; PSMF ¶ 50; Pl.'s SMF in Opp'n ¶¶ 17, 18.) According to Vicki Pannell, who during the relevant time period was the Acting Manger of Availability in Memphis, this posting was in error, was later pulled, and all bidders deemed ineligible. (ECF No. 72-13, Decl. of Vicki Pannell ¶ 8.)

- Shaw argues that another in-section bid at the Airport Station occurred on October 7, 2009, and that she was denied her retreat rights to all vacant positions. (PSMF ¶ 58.) The documents Shaw cites as support appear to be charts of in-section bid activity at the USPS. (ECF No. 83-1 at 79-80; ECF No. 84-10.) There is no evidence submitted to provide any

---

[20]The events surrounding the posting of this clerk position in August 2009 were the subject of a separate EEO charge filed by Shaw. Shaw filed a complaint in this court in 2011 relating to this charge. As discussed above, this court dismissed that complaint as untimely, and the Sixth Circuit affirmed. Shaw's Statement of Material Facts ¶¶ 50-57 relate to those events.

further explanation about these documents. These documents do not show that Shaw was denied retreat rights to vacant positions.

- Shaw asserts that she was denied retreat rights to six newly established clerk positions at the Airport Station on November 12, 2009. (PSMF ¶¶ 59-60.) The documents Shaw cites as support do not include any evidence to explain the significance of these documents titled "Human Capital Enterprise Systems Vacancy Notice." (ECF No. 84-11.) These documents appear to relate to available positions within the Airport Station, but do not show that Shaw was denied retreat rights to any residual vacancy.

- Shaw also notes that USPS employee Sandra Chism (who had no prior EEO activity) was granted retreat rights on December 14, 2009. (PSMF ¶ 61.) This fact appears to have no relevance to the instant motions.

- Shaw states that Williams, Moragne, Richardson, Jackson, Ragland, and Baker (who Tate and Williford knew had no prior EEO activity) "were processed into five (5) newly established clerk positions at the Airport Station on December 2, 2009 and/or January 27, 2010." (PSMF ¶¶ 62-63.) The documents she cites in support are titled "Notification of Personnel Action" and relate to the employees Shaw identified. (ECF No. 84-13.)

However, there is no evidence submitted that explains what these documents are or how they support her claims.

- Shaw states that she was denied retreat rights when job #70378026 was placed for in-section bid in March 25, 2010, and eventually occupied by Sheila Davis in May 2010. (PSMF ¶¶ 64-65, 67.) The documents Shaw cites in support appear to relate to a posting of a position in March 2010 and training for Davis during 2010. (ECF No. 84-14.) However, there is no evidence to explain what these documents are or how they support her claims.[21]

- Finally, Shaw states that Williford "falsified two Detail Assignment Orders for Plaintiff effective July 24, 2010 to December 31, 2010 and January 1, 2011 to May 20, 2011." (PSMF ¶ 71.) The document Shaw cites in support is titled "Assignment Order," but the court cannot determine how the document supports Shaw's claims. (ECF No. 84-17.)

While still working at the P&DC, on or about April 2, 2010, Shaw was offered a job at the Airport Station. (DSMF ¶ 18; Shaw Dep. 187-88.) This job would have required her to work from 5:00 a.m. to 2:00 p.m., with Sunday and Thursday scheduled as off days. (DSMF ¶ 18; Shaw Dep. 187-88.) Shaw refused the offer, apparently

---

[21]Shaw relies on these same documents in support of her statement that Tate and Williford denied her retreat rights to another vacant clerk position at the Airport Station on July 8, 2010. (PSMF ¶ 69.) Again, there is no evidence to explain what these documents are or how they support her claims.

insisting that she be awarded position #95115693 - which, as discussed above, had been withdrawn in October 2009 as a posting error. (PSMF ¶ 66; ECF No. 72-13 ¶ 8; ECF No. 72-14.) Later, Shaw participated in a grievance process that was resolved by awarding her the job at the Airport Station that was previously held by Rochelle Johnson. (DSMF ¶ 19.) On July 23, 2010, Shaw was notified to return to the Airport Station effective July 26, 2010. (DSMF ¶ 19.) Shaw's new job at the Airport Station allowed her to have Saturday and Sunday off days and did not require her to perform window duties. (ECF No. 72-12, Decl. of Joseph Pegues ¶ 11.)

Prior to settlement discussions being resolved, Shaw was selected for training on the Small Bundle Sorter Machine. (DSMF ¶ 19.) This was a machine that she needed to know how to work for the job at the P&DC. (DSMF ¶ 19.) She did not need knowledge of this machine at the Airport Station. (DSMF ¶ 19; Shaw Dep. 214-15.) Once it was determined that Shaw would be going back to the Airport Station, the P&DC manager ordered that the training be terminated. (DSMF ¶ 20; ECF No. 72-16, June 16, 2010 Email from J. Mcmahan to C. Walls.) Shaw complained about the termination of the training. (DSMF ¶ 20.) The USPS immediately reinstated the training. (DSMF ¶ 20.) Shaw completed the training. (DSMF ¶ 20.)

## C. Cross-Motions for Summary Judgment

In her Motion for Summary Judgment, Shaw argues that she is entitled to summary judgment on each of her claims. Shaw asserts that she has established that the USPS was aware of her prior EEO activity and that she was retaliated against due to her prior EEO activity. Shaw also argues that she is entitled to summary judgment on her religious discrimination claim because the USPS was aware of their employees' religious beliefs and practices, her religious beliefs were sincere, and she was treated less favorably than other similarly situated employees. Shaw further asserts that she has established that the instances of alleged discrimination created a hostile work environment. Shaw next asserts that she is entitled to summary judgment on her emotional distress and physical injury claims. Finally, Shaw argues that she is entitled to summary judgment on her claim arising under the National Labor Relations Act because she has established that the USPS breached its collective bargaining agreement with the union.

In its Motion for Summary Judgment, the USPS moves for summary judgment only on Shaw's religious discrimination and retaliation claims. The USPS argues that to the extent Shaw is alleges a failure to accommodate cause of action, Shaw has not carried her burden of demonstrating a *prima facie* case because she cannot demonstrate that she has a sincere religious belief that conflicts with an employment requirement, her employer was not aware of her beliefs because she had never made any request for an

accommodation, and she was not disciplined for failing to comply with a conflicting employment requirement. The USPS also argues that Shaw cannot establish religious discrimination because she has not suffered a materially adverse employment action and has not demonstrated that she was treated differently than other similarly situated employees. The USPS next argues that Shaw has not established a *prima facie* case of retaliation because she cannot demonstrate that her employer knew at the time of each alleged discriminatory act that she had engaged in protected EEO activity, that she suffered any adverse employment actions, or that a causal connection exists between the allegedly adverse actions and the exercise of her EEO rights. Finally, the USPS argues that even if Shaw could establish a *prima facie* case, her religious discrimination and retaliation claims still fail because the USPS has articulated legitimate, non-discriminatory reasons for the allegedly adverse employment action, and Shaw cannot demonstrate that the proferred reasons are pretext for intentional discrimination.

## II.  PROPOSED CONCLUSIONS OF LAW

### A.  Standard of Review

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also

Geiger v. Tower Auto., 579 F.3d 614, 620 (6th Cir. 2009). In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). "The moving party bears the initial burden of production." Palmer v. Cacioppo, 429 F. App'x 491, 495 (6th Cir. 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Once the moving party has met its burden, "the burden shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" Jakubowski v. Christ Hosp., Inc., 627 F.3d 195, 200 (6th Cir. 2010) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "[I]f the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which the nonmovant has the burden, the moving party is entitled to summary judgment as a matter of law." Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001). "The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Palmer, 429 F. App'x at 495 (quoting Anderson, 477 U.S. at 251-52) (internal quotation marks omitted).

"When parties file cross-motions for summary judgment, 'the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily

justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001) (quoting 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2720 (3d ed. 1998)). "A trial court may conclude, when reviewing the undisputed material facts agreed upon by the parties and drawing all inferences, in turn, for the non-moving party, that a genuine issue exists as to those material facts, in which case the court is not permitted to resolve the matter, but rather, must allow the case to proceed to trial." Id. (citing ITCO Corp. v. Michelin Tire Corp., Comm. Div., 722 F.2d 42, 45 n.3 (4th Cir. 1983)).

**B.    Religious Discrimination Claims**

Title VII makes it unlawful for an employer to discriminate against individuals based on their race, color, sex, religion, or national origin. 42 U.S.C. § 2000e-2(a)(1). To prevail on a claim of religious discrimination under Title VII, a plaintiff must present either direct evidence of discrimination or a *prima facie* case of indirect discrimination. Burdette v. Fed. Exp. Corp., 367 F. App'x 628, 632 (6th Cir. 2010) (citing Tepper v. Potter, 505 F.3d 508, 515 (6th Cir. 2007)). "'[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.' Such evidence 'does not require a factfinder to draw any

inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.'" Tepper, 505 F.3d at 516 (quoting Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003)). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." Ondricko v. MGM Grand Detroit, LLC, 689 F.3d 642, 649 (6th Cir. 2012) (citing Kline v. Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997)). Shaw has not presented any direct evidence of religious discrimination.

If the plaintiff provides no direct evidence of discrimination, the plaintiff must establish a *prima facie* case of discrimination through circumstantial evidence to make a claim under Title VII. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). A plaintiff establishes a *prima facie* case of religious discrimination under Title VII by showing that he or she (1) is a member of a protected group; (2) was subject to an adverse employment action; (3) was qualified for the position; and (4) a similarly situated, non-protected employee was treated more favorably. Clayton v. Meijer, Inc., 281 F.3d 605, 610 (6th Cir. 2002); Primes v. Reno, 190 F.3d 765, 766 (6th Cir. 1999). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate one or more legitimate, non-discriminatory

reasons for the employment decision.  <u>Briggs v. Potter</u>, 463 F.3d

507, 514 (6th Cir. 2006).  If the defendant carries that burden,

the plaintiff bears the burden of persuading the court by a

preponderance of the evidence that each proffered reason is untrue

and thus a pretext for intentional discrimination.  <u>St. Mary's</u>

<u>Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515 (1993); <u>Manzer v. Diamond</u>

<u>Shamrock Chems. Co.</u>, 29 F.3d 1078, 1084 (6th Cir. 1994).

In a discrimination claim brought under Title VII, an adverse

employment action has been defined as "a materially adverse change

in the terms and conditions of [a plaintiff's] employment." <u>Deleon</u>

<u>v. Kalamazoo Cnty. Rd. Comm'n</u>, 739 F.3d 914, 918 (6th Cir. 2014).

"A mere inconvenience or an alteration of job responsibilities" is

not enough to constitute an adverse employment action.  <u>Choulagh v.</u>

<u>Holder</u>, 528 F. App'x 432, 438 (6th Cir. 2013) (citing <u>Hollins v.</u>

<u>Atl. Co.</u>, 188 F.3d 652, 662 (6th Cir. 1999)).  Rather, an adverse

employment action results in "a significant change in employment

status, such as hiring, firing, failing to promote, reassignment

with significantly different responsibilities, or a decision

causing a significant change in benefits." <u>Burlington Indus. v.</u>

<u>Ellerth</u>, 524 U.S. 742, 761 (1998).  "The Sixth Circuit has

consistently held that de minimis employment actions are not

materially adverse and, thus, are not actionable." <u>Bowman v.</u>

<u>Shawnee State Univ.</u>, 220 F.3d 456, 463 (6th Cir. 2000); <u>see also</u>

<u>Seay v. Fortune Plastics, Inc.</u>, No. 3:09-cv-0605, 2012 WL 610006, at *5 (M.D. Tenn. Feb. 24, 2012).

**C.    Retaliation Claims**

"Title VII forbids employer retaliation against employees for making a charge, testifying, assisting, or participating in a Title VII investigation, proceedings, or hearing." <u>Goodsite v. Norfolk S. Ry. Co.</u>, No. 3:11CV1166, 2013 WL 3943505, at *5 (N.D. Ohio July 31, 2013) (citing <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 59 (2006)).    To establish a *prima facie* case of retaliation, a plaintiff must show that he or she (1) engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the employer; (3) the employer thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.    <u>Morris v. Oldham Cnty. Fiscal Court</u>, 201 F.3d 784, 792 (6th Cir. 2000); <u>see also</u> <u>Wright v. AutoZone Stores, Inc.</u>, 951 F. Supp. 2d 973, 996 (W.D. Mich. 2013) (citing <u>Morris</u>, 201 F.3d at 792).    The <u>McDonnell Douglas</u> burden-shifting framework also applies to retaliation claims.    <u>Mickey v. Zeidler Tool & Die Co.</u>, 516 F.3d 516, 523 (6th Cir. 2008).

"The Supreme Court in [<u>Burlington Northern</u>], however, made clear that the scope of Title VII's retaliation provision is broader than that of Title VII's discrimination provision." <u>Hawkins v. Anheuser-Busch, Inc.</u>, 517 F.3d 321, 345 (6th Cir. 2008).

"In contrast to Title VII's discrimination provision, the 'adverse employment action' requirement in the retaliation context is not limited to an employer's actions that solely affect the terms, conditions or status of employment, or only those acts that occur at the workplace." Id. (citing Burlington Northern, 548 U.S. at 64). "The retaliation provision instead protects employees from conduct that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. (citing Burlington Northern, 548 U.S. at 68); see also Taylor v. Geithner, 703 F.3d 328, 336 (6th Cir. 2013) ("Further, the Supreme Court has recognized that actions typically construed as nonmaterial could rise to the level of an adverse employment action when considered in context . . . .").

**D.   Failure to Accommodate**

The USPS moves for summary judgment on the failure to accommodate claim. As an initial matter, as the USPS points out, it is not entirely clear whether Shaw is even bringing a claim based on a failure to accommodate her religious beliefs. Given her status as a *pro se* plaintiff, the court will assume that such a claim has been made. To establish a *prima facie* claim for failure to accommodate under Title VII, Shaw must show that she: (1) holds a sincere religious belief that conflicts with an employment requirement; (2) informed her employer about the conflict; and (3) was discharged or disciplined for failing to comply with the

conflicting employment requirement.  <u>Burdette</u>, 367 F. App'x at 633 (citing <u>Tepper</u>, 505 F.3d at 514).  "Once the plaintiff has established a prima facie case, the burden shifts to the defendant employer to show that it could not reasonably accommodate the employee without undue hardship." <u>Virts v. Consol. Freightways Corp. of Del.</u>, 285 F.3d 508, 516 (6th Cir. 2002).  Assuming, *arguendo*, that Shaw can satisfy the first prong of her *prima facie* case, the court finds that no reasonable juror could find that she has satisfied the second or third prongs.  Shaw has never made a request for an accommodation so that she could be off work on Sundays for mandatory religious observances.  Shaw has presented no evidence that she failed to comply with an employment requirement and no evidence that she was ever discharged or disciplined for doing so.  Therefore, to the extent that Shaw claims a failure to accommodate based on her religious beliefs, it is recommended that the USPS's Motion for Summary Judgment be granted and that Shaw's Motion for Summary Judgment be denied on that claim.

**E.  Discrimination and Retaliation Claims**

      1.  <u>Denial of overtime</u>

Shaw alleges that the denial of her overtime on various dates between May 7, 2008, and July 16, 2008, were instances of religious discrimination and retaliation.  The Sixth Circuit has found that the loss of overtime pay can constitute an adverse employment action.  <u>Lentz v. City of Cleveland</u>, 333 F. App'x 42, 57 (6th Cir.

2009) (citing <u>Broska v. Henderson</u>, 70 F. App'x 262, 267-68 (6th Cir. 2003)); <u>Campbell v. Nally</u>, No. 2:10-cv-1129, 2012 WL 4513722, at *8 (S.D. Ohio Oct. 1, 2012) (finding that a transfer that resulted in lost opportunities for overtime pay and a reduction in overall income raised a genuine issue with regard to whether the transfer is an adverse employment action). Regarding her religious discrimination claim, "in order to survive summary judgment, [Shaw] must produce evidence sufficient to raise a genuine issue of material fact as to whether she was denied overtime opportunities or whether comparable non-protected employees were given overtime opportunities that she was denied." <u>Jarvis v. Mich. Bell. Tel. Co.</u>, No. 08-12262, 2010 WL 1002620, at *3 (E.D. Mich. Mar. 17, 2010) (quoting <u>Broska</u>, 70 F. App'x at 268) (internal quotation marks omitted). Lost overtime opportunities can be adverse employment actions when the overtime opportunities lost were both relatively regular in their occurrence and significant in the monetary impact. <u>See</u> <u>Gates-Lacy v. Cleveland Dep't of Pub. Safety</u>, No. 1:09CV2593, 2011 WL 4368921, at *6 (N.D. Ohio Sept. 19, 2011). Extremely small monetary loss that is not reimbursed is not sufficient to constitute an adverse employment action. <u>Coburn v. Cargill, Inc.</u>, No. 09-2844-JPM-dkv, 2012 WL 6607287, at *15 (W.D. Tenn. Dec. 18, 2012) (citing <u>Kindle v. Waukegan Cmty. Unit Sch. Dist. 60</u>, No. 07 C 4643, 2009 WL 4043384, at *5 (N.D. Ill. Nov. 19, 2009) ("Kindle's claim that she was denied Good Friday pay

constitutes, at most, one day of missed pay per year for nine years. It is unlikely that a reasonable juror could determine that such a de minimis economic loss constitutes an actionable adverse employment action.")).

With regard to the religious discrimination claim, the court finds that the alleged instances of denied overtime do not amount to a materially adverse employment action. Shaw has not supported her claim that she was ever, in fact, denied overtime opportunities. Nor does Shaw provide any evidence to demonstrate why she was entitled to overtime hours on any specific dates over any of her co-workers. Shaw does not allege that the opportunity for overtime was completely foreclosed to her - rather, she alleges that on a few, distinct occasions, she was not asked to work overtime on her off days. In fact, Shaw herself foreclosed the opportunity for future overtime work when she removed herself from the Overtime Desired call list on July 30, 2008. At most Shaw is alleging the loss of approximately eleven days of overtime pay. Such a de minimis economic loss does not constitute an actionable adverse employment action. As a result, no reasonable juror could find that Shaw has established a claim of discrimination based on the alleged denial of overtime. See Kindle, 2009 WL 4043384, at *5.

With regard to Shaw's retaliation claim, the court similarly finds, for reasons stated above, that no reasonable juror could

find that a reasonable employee would have found the challenged action materially adverse such that it would have dissuaded a reasonable worker from making or supporting a charge of discrimination. Additionally, the court concludes that no reasonable juror could find that a causal connection exists between Shaw's protected EEO activity in February 2008 and any denial of overtime in May 2008. This alleged adverse action occurred three months after Shaw's participation in Johnson's EEO conference. See Newton v. Ohio Dep't of Rehab. & Corr.-Toledo Corr. Inst., 496 F. App'x 558, 567 (6th Cir. 2012) (affirming summary judgment for the defendant on a retaliation claim where the only evidence to support causation was the temporal proximity of slightly over three months between the plaintiff's filing of her complaint of sexual harassment and her termination); Kean v. IT-Works, Inc., 466 F. App'x 468, 471 (6th Cir. 2012) (affirming summary judgment for the defendant based on the finding that the plaintiff could not satisfy the causation element of a retaliation claim because "[h]er only evidence of causation is that the discharge came roughly two-and-a-half months after the complaint" of a hostile work environment). Moreover, on either May 5 or May 6, 2008, Tate called Shaw to report to work for overtime on Tuesday, May 6 (which she declined). Shaw then apparently worked overtime on May 13, 2008. (ECF No. 83-1.) Shaw subsequently filed her EEO complaint Charge No. 08 on May 30, 2008, and then apparently again worked overtime on July 23 and

July 30, 2008, (ECF No. 83-1), before removing herself from the Overtime Desired List on July 30, 2008. Under these facts, no reasonable juror could conclude that a causal connection exists between her EEO activities and the alleged denial of overtime.

2. Unsafe environment

Shaw claims religious discrimination and retaliation when she was required to work alone and in an "unsafe environment" on various dates in May, June, and July 2008. Shaw has provided no evidence that she ever worked alone or that this alleged "unsafe environment" could amount to an adverse employment action. Therefore, no reasonable juror could find that she suffered an adverse employment action to support either her religious discrimination or retaliation claims.

3. Change in reporting time

Shaw alleges that she was discriminated against based on her religion and retaliated against when (at her request) her Sunday reporting time was changed on July 11, 2008. This event, however, does not amount to an adverse employment action under either a religious discrimination or retaliation claim. The court does not see how a change in Shaw's schedule (made at her request) could amount to an adverse employment action. In any event, requiring an employee to work certain shifts, even if that shift requires them to work alone, does not constitute an adverse employment action. See, e.g., Goodsite, 2013 WL 3943505, at *7 ("[T]he requirement

that Plaintiff follow Norfolk Southern's work assignment policies, which occasionally required her to work . . . the single position, something she apparently preferred not to do, did not result in an actual harm or injury that affected Plaintiff in a materially adverse manner.").

    4.  Denial of change of schedule

Shaw alleges another instance of religious discrimination and retaliation when she was denied a change of schedule for personal convenience on July 17, September 22, and November 23, 2008. The Sixth Circuit has found that the USPS's denial of discretionary schedule adjustments is not an adverse employment action for purposes of a discrimination and retaliation claim. Blake v. Potter, 247 F. App'x 673, 675 (6th Cir. 2007) ("Ms. Blake has provided no evidence whatsoever that the denial of these discretionary schedule changes is in any way comparable to 'termination of employment, a demotion evidenced by decrease in wage or salary,' Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 886 (6th Cir. 1996), or resulted in her having a 'less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.' Id. . . . Because Ms. Blake failed to present evidence sufficient to support this element of her prima facie case of discrimination or of retaliation, we conclude . . . that the grant of summary judgment in favor of the USPS was

proper."). The court here concludes that Shaw has presented no evidence that would allow a reasonable juror to conclude that Shaw has established a claim of discrimination or retaliation when her request for a change of schedule for personal convenience was denied. See Keeling v. Horizons Youth Servs., L.C., No. 3:10-23-DCR, 2011 WL 2633530, at *7 (E.D. Ky. July 5, 2011) (finding that a schedule change that forces an employee to accept a work schedule that conflicts with religious activities is not a significant change in employment status and therefore is not a materially adverse employment action); see also Ogden v. Potter, 397 F. App'x 938, 939 (5th Cir. 2010) ("A single denial of leave is not an adverse employment action when it affects leave on a specific date and time, but not the employee's amount of or right to take leave in general."); Carlson v. Leprino Foods Co., 522 F. Supp. 2d 883, 888 (W.D. Mich. 2007) ("Denial of leave requests or specific days off, standing alone, do not amount to materially adverse employment actions.").

Moreover, the court finds that no reasonable juror could conclude that a similarly situated employee was treated more favorably. Of the three Airport Station clerks identified by Shaw as having received favorable treatment when they were allowed not to work on Sundays to accommodate religious practices, Shaw has only presented evidence of Baker's religious affiliation (Jehovah's Witness). However, there is no evidence that Baker received

favorable treatment because she worked on Sundays with Shaw until the time Baker went on maternity leave. As for Richardson and Jackson, Shaw has presented no evidence as to their religious affiliations or that Tate or Williford knew of these clerks' religious affiliations. Both Tate and Williford testified that they were unaware of the religious practices of Richardson and Jackson.

     5. <u>Involuntary reassignment to the P&DC</u>

     Shaw alleges that the abolishment of her position at the Airport Station and her reassignment from the Airport Station to the P&DC was an act of religious discrimination and retaliation. With regards to Shaw's discrimination claim, the Sixth Circuit Court of Appeals has held that "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." <u>Kocsis</u>, 97 F.3d at 885-86 (citing <u>Yates v. Avco Corp.</u>, 819 F.2d 630, 638 (6th Cir. 1987)); <u>see</u> <u>Peake v. Brownlee</u>, 339 F. Supp. 2d 1008, 1022 (M.D. Tenn. 2003) (finding that transferring an employee's work station between buildings did not constitute an adverse employment action, concluding, "[c]learly, this action was at most an inconvenience or alteration in her work routine and did not constitute more than a de minimis action"); <u>Vannoy v. OCSEA Local 11</u>, 36 F. Supp. 2d 1018, 1023-24 (S.D. Ohio Feb. 23, 1999) (finding that plaintiff had not established that she had suffered an adverse employment action

based on a reassignment because she was not discharged, rather reassigned to another position with no loss of pay or benefits). "[E]ven if a reassignment is not paired with a salary or work-hour change, it can nonetheless be considered an adverse employment action where there is evidence that the employee received a 'less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" Spees v. James Marine, Inc., 617 F.3d 380, 391 (6th Cir. 2010) (quoting Kocsis, 97 F.3d at 886). "The case law thus indicates that an employee's transfer may constitute a materially adverse employment action, even in the absence of a demotion or pay decrease, so long as the particular circumstances present give rise to some level of objective intolerability." Deleon, 739 F.3d at 918-19. When determining whether a reassignment or relocation of a work station is materially adverse, one factor that can be considered is increased commute distance. See Keeton v. Flying J, Inc., 429 F.3d 259, 265 (6th Cir. 2005) (concluding that jury could have reasonably found, under the facts of the particular case, that plaintiff's transfer to a position involving the same responsibilities and pay constituted an adverse employment action where the transfer "increased the plaintiff's commute to the extent he needed to consider relocation"); Akers v. Alvey, 338 F.3d 491, 498 (6th Cir. 2003) (finding that transfer was not an adverse employment action

when she did not suffer a decrease in pay, her job duties were not significantly changed, and the transfer actually reduced her roundtrip commute); Nelson v. Gen. Elec. Co., 2 F. App'x 425, 432-33 (6th Cir. 2001) (concluding that a longer commute with the same job title, salary, and benefits is not an adverse employment action).

Here, Shaw's relocation was not a materially adverse employment action. The reasoning of the court in Arnold v. City of Columbus, No. 2:08-CV-0031, 2011 WL 1303593 (S.D. Ohio Mar. 31, 2011), aff'd, 515 F. App'x 524 (6th Cir. 2013), is persuasive. In Arnold, a plaintiff brought a Title VII action against her employer, alleging in part that she suffered an adverse employment action when she was transferred between bureaus. The court concluded that the transfer was not an adverse employment action, reasoning:

> To establish that she suffered an adverse action, Plaintiff must cite evidence that her reassignment, even if involuntary, was to a less prestigious position or a position with significantly diminished material responsibilities, resulted in a change to her salary, benefits or work hours, or otherwise amounted to a demotion based on "other indices . . . unique to [the] particular situation." Kocsis, 97 F.3d at 885-87; see also [White, 364 F.3d at 803] (reassignment that resulted in no loss of salary or benefits was a demotion because new position was "more arduous and 'dirtier,'" and previous position "required more qualifications, which is an indication of prestige," and "was objectively considered a better job and the male employees resented [plaintiff] for occupying it"); . . . Strouss v. Mich. Dep't of Corr., 250 F.3d 336, 343 (6th Cir. 2001) (in Title VII retaliation context, nurse's lateral transfer to another facility where she may have been put into

contact with prisoners who had issued threats against her
constituted an adverse action); <u>Mosholder v. Barnhardt</u>,
No. 09-CV-11829-DT, 2010 WL 5559406, at *7 (E.D. Mich.
Feb. 12, 2010) (implying that involuntary transfer was in
itself not an adverse action, but could be considered an
adverse action where it also resulted in a loss of
guaranteed holidays and weekends off, a change in job
responsibilities, and a move to a more dangerous position).

Plaintiff cites no evidence that her position in the
Emergency Services Bureau is less prestigious, involves
diminished responsibilities or reduced pay or benefits,
or is in any way less desirable than her former position
in the FPB. The Court has no duty to comb the record in
search of such evidence. <u>See</u> [<u>Nerswick v. CSX Transp.,
Inc.</u>, 692 F. Supp. 2d 866, 882 (S.D. Ohio 2010)]. Thus,
Plaintiff fails to establish that her transfer from FPB
to the Emergency Services in September 2006 was an
adverse action.

<u>Arnold</u>, 2011 WL 1303593, at *12-13. Similarly here, Shaw has

provided no evidence that her position at the P&DC was less

prestigious, involved diminished responsibilities or reduced pay or

benefits, or was in any way less desirable than her former position

at the Airport Station. Indeed, Shaw has provided no evidence

regarding the terms, conditions, responsibilities, or benefits of

either her position at the Airport Station or her reassigned

position at the P&DC - and thus, no facts from which a comparison

of these positions can be made. Although there is some evidence in

the record to suggest that Shaw's commute may have been longer to

the P&DC (less than 20 miles), the court finds the additional

commute time to be a de minimis intrusion or a "mere

inconvenience," at most. Therefore, the court finds that no

reasonable juror could conclude that Shaw has established a claim

of religious discrimination when she was reassigned to the P&DC.

Similarly, the court finds that no reasonable juror could conclude that Shaw has established a claim of retaliation based on her reassignment to the P&DC.  As reasoned by the court in <u>Finley v. University of Tennessee Knoxville Department of University Housing</u>, No. 3:09-CV-304, 2012 WL 1327809 (E.D. Tenn. Apr. 17, 2012):

> The Department's reorganization impacted three employees, none of whom lost their employment.  Finley's position as Buyer's Assistant was eliminated and he was transferred to the Senior Secretary position in Strong Hall.  The transfer did not impact his income or benefits.  The record shows that although some of his duties changed, his level of responsibility essentially remained the same.  Both positions were classified as Administrative Support Assistant positions.  Finley concedes that he experienced no reduction in pay or benefits as a result of the transfer.  He makes no complaint about increased hours, increased responsibilities, or diminished prestige resulting from the transfer.  Because Finley has produced no evidence that his reassignment constituted a materially adverse employment action, he cannot establish a *prima facie* case of retaliation with regard to his transfer . . . .

<u>Id.</u> at *5.  Therefore, the court finds that no reasonable juror could conclude that Shaw has established a claim of retaliation when she was reassigned to the P&DC.

6.  <u>Termination of training</u>

Shaw also alleges that the termination of scheduled training for the Small Bundle Sorter Machine was an instance of retaliation. The temporary cancellation of the training, however, was not an adverse employment action because the training was for a machine

that Shaw would no longer use at the Airport Station. Nevertheless, despite the fact that Shaw would be returning to her preferred job at the Airport Station and thus would not need to use the Small Bundle Sorter Machine, the USPS reinstated the training when Shaw complained. The court finds that no reasonable juror could conclude that Shaw has established a claim of retaliation when her training (on a machine she would no longer be operating) was temporarily canceled. See Johnson-Romaker v. Kroger Ltd. P'ship One, 609 F. Supp. 2d 719, 726 (N.D. Ohio 2009) (finding that plaintiff had not demonstrated that denial of training was an adverse employment action because she had not provided "any evidence that [her employer] would refrain from occasionally cutting her hours if she received cross-training" and she did not "give examples of non-[protected class] employees who avoided having their hours cut because [the employer] had granted their cross-training requests"). But see Clay v. United Parcel Serv., 501 F.3d 695, 710 (6th Cir. 2007) (finding that a failure to train employee that resulted in a deprivation of increased compensation was an adverse employment action).

    7. Denial of retreat rights

    Shaw also asserts that on various occasions she was not given the opportunity to return to the Airport Station after being reassigned to the P&DC until July 2010. See supra Section I.B. Shaw was entitled to return to the Airport Station upon the first

residual vacancy in the salary level after employees at the Airport Station completed bidding. However, there were never any residual vacancies at the Airport Station after Shaw's reassignment. Nevertheless, Shaw argues that her retreat rights were denied. As thoroughly demonstrated, the court has carefully reviewed all evidence Shaw has cited in support of these claims, and as previously explained, these documents do not constitute evidence that Shaw was at any point improperly denied her retreat rights. Thus, no reasonable juror could find that she suffered any adverse employment action in retaliation for her EEO activity as it relates to her efforts to return to the Airport Station.

For all the above reasons, it is recommended that the USPS's Motion for Summary Judgment be granted in its entirety, and that Shaw's Motion for Summary Judgment as it relates to the religious discrimination and retaliation claims be denied.

## F.  Hostile Work Environment

Shaw also moves for summary judgment on her hostile work environment claim.[22]  "A hostile work environment occurs 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  <u>Bourini v. Bridgestone/Firestone N. Am. Tire, LLC</u>,

---

[22]The USPS does not move for summary judgment on Shaw's hostile work environment claim.

136 F. App'x 747, 750 (6th Cir. 2005) (quoting <u>Harris v. Forklift</u>
<u>Sys., Inc.</u>, 510 U.S. 17, 21 (1993)).   The court looks to the
totality of the circumstances to determine whether there was a
hostile work environment.   <u>Id.</u>   "The conduct must be severe and
pervasive enough to create an environment that a reasonable person
would find hostile or abusive, and that the victim must
subjectively regard as abusive."   <u>Id.</u> (citing <u>Bowman</u>, 220 F.3d at
463).   "In analyzing such a claim, a court must consider '[t]he
frequency of the discriminatory conduct; its severity; whether it
is physically threatening or humiliating, or a mere offensive
utterance; and whether it unreasonably interferes with an
employee's work performance.'"   <u>Burdette</u>, 367 F. App'x at 633
(quoting <u>Hafford v. Seidner</u>, 183 F.3d 506, 512 (6th Cir. 1999)).
"[S]imple teasing, offhand comments, and isolated incidents (unless
extremely serious) will not amount to discriminatory changes in the
terms and conditions of employment."   <u>Faragher v. City of Boca</u>
<u>Raton</u>, 524 U.S. 775, 778 (1998) (internal citations and quotation
marks omitted).

In her motion, Shaw's only argument as it pertains to her
hostile work environment claim is as follows:

> Plaintiff has established there is no dispute that the
> harassment and disparate treatment of her by Supervisor
> Williford, Manager Tate, and Labor/Human Resources
> Specialists was severe and pervasive with regard to
> denial of Plaintiff off day overtime on a rotating basis;
> denied Plaintiff a safe work environment; subjected
> Plaintiff to a hostile work environment; changed
> Plaintiff's bid work hours; reverted Plaintiff's bid

position; involuntarily reassigned Plaintiff outside of
the Airport Station (section); denied Plaintiff right to
in-section bid; continually denied Plaintiff retreat
rights to the Airport Station (section); terminated
Plaintiff's SPBS training; and refused to process
Plaintiff's bid award; assigned Plaintiff more onerous
work assignments than similarly situated AMC Station
clerks. The continuing adverse employment actions
suffered by Plaintiff occurred under circumstances giving
rise to an inference of discriminatory intent. Plaintiff
has established a prima facie case of severe and
pervasive behavior/conduct by management officials and
co-workers retaliatory harassment and disparate treatment
to constitute a continuing violation claim.

(ECF No. 71 at 15-16.) The court finds that these allegations do

not rise to the level of a hostile work environment. The conduct

as alleged is not sufficiently severe or pervasive such that a

reasonable person would find it hostile or abusive. Moreover, Shaw

has not alleged any type of interference with her work performance

resulting from the alleged conduct, or any way in which it altered

the conditions of her employment. Additionally, Shaw has not

demonstrated that the complained of actions were conducted with

religion-based discriminatory intent. Thus, Shaw has not

established a prima facie case of Title VII discrimination based

upon a hostile work environment. See Fullen v. City of Columbus,

514 F. App'x 601, 608-09 (6th Cir. 2013) (finding, in part, that

isolated incidents of alleged discrimination were not sufficiently

pervasive to establish a hostile work environment claim, and thus

"[n]o reasonable jury could conclude that the plaintiff had

experienced harassment that was sufficiently severe or pervasive to

alter the conditions of his employment and create an abusive

working environment") (citing <u>Berryman v. SuperValu Holdings, Inc.</u>, 669 F.3d 714, 720, 722 (6th Cir. 2012)). It is recommended that Shaw's Motion for Summary Judgment on her hostile work environment claim be denied.

## G. Intentional Infliction of Emotional Distress/Intentional Infliction of Physical Injury Claims

Shaw also moves for summary judgment on her claims of intentional infliction of emotional distress ("IIED") and intentional infliction of physical injury.[23] As it relates to these claims, Shaw states in her Motion for Summary Judgment:

> Plaintiff has established an emotional distress claim due to ongoing severe and pervasive discriminatory and retaliatory conduct/behavior toward her because of retaliation for engaging and participation in EEO activity and disparate treatment. Currently Plaintiff is entitled to summary judgment on her emotional distress and physical injury claims.

> As a result, Plaintiff was left with substantial loss with regard to use of sick leave hours and/or vacation in order to avoid and to be relieved of stress from adverse workplace conditions, emotional distress and physical injuries as well as having to work undesirable hours to perform more onerous duties. Accordingly,

_____

[23]The USPS has not moved for summary judgment and has failed to respond to Shaw's Motion for Summary Judgment as it relates to her claims of intentional infliction of emotional distress, intentional infliction of physical injury, and her claim under the Labor Management Relations Act. The court cannot grant Shaw's Motion for Summary Judgment, however, "simply because Defendant has failed to respond." <u>Patterson v. Anderson</u>, No. 3-10-0464, 2012 WL 589489, at *1 (M.D. Tenn. Feb. 22, 2012) (citing <u>Stough v. Mayville Cmty. Sch.</u>, 138 F.3d 612, 614 (6th Cir. 1998)). "The Court must find that [Shaw] has carried [her] burden to show that there are no disputed issues of fact and that [Shaw] is entitled to judgment as a matter of law." <u>Id.</u>

> Plaintiff is entitled to summary judgment on her
> emotional distress and physical injury claim.

(ECF No. 71 at 16-17.)

"The elements of an intentional infliction of emotional distress claim are that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." Rogers v. Louisville Land Co., 367 S.W.3d 196, 205 (Tenn. 2012) (citing Lourcey v. Estate of Scarlett, 146 S.W.3d 48, 51 (Tenn. 2004); Leach v. Taylor, 124 S.W.3d 87, 92 (Tenn. 2004)). "Outrageous conduct does not include 'mere insults, indignities, threats, annoyances, petty oppression or other trivialities.'" Rosen v. Guardsmark, LLC, No. 13-2369-STA-tmp, 2013 WL 6814421, at *8 (W.D. Tenn. Dec. 20, 2013) (quoting Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997)). "Thus, a plaintiff seeking damages for IIED must meet 'an exacting standard,' one which requires a plaintiff to prove conduct is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (quoting Miller v. Willbanks, 8 S.W.3d 607, 614 (Tenn. 1999)). "Recovery for intentional infliction of emotional distress is limited to mental injury which is so severe that no reasonable person would be expected to endure it." Id. (quoting Arnett v. Domino's Pizza I, L.L.C., 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003)). "Discrimination or termination of one's

employment is typically insufficient to prove an IIED claim." Id. (quoting Nettles v. Hotel Peabody, G.P., No. 2:09-CV-02776-JPM, 2010 WL 5093362, at *3 (W.D. Tenn. Dec. 8, 2010)). "The outrageous conduct requirement is a high standard which has consistently been regarded as a significant limitation on recovery." Nettles, 2010 WL 5093362, at *2 (quoting Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville, 154 S.W.3d 22, 39 (Tenn. 2005)).

Other than the previously discussed allegations of religious discrimination and retaliation, Shaw has not provided any evidence to support her claim for intentional infliction of emotional distress. The sporadic instances of alleged religious discrimination and retaliation do not meet Tennessee's very high standard for outrageousness. See Nettles, 2010 WL 5093362, at *3 (citing Mays v. Int'l Mill Servs., Inc., No 05-1367-T/AN, 2006 WL 208874, at *4-5 (W.D. Tenn. Jan. 26, 2006)). As a result, Shaw is not entitled to summary judgment on her intentional infliction of emotional distress claim.

As to Shaw's claim for "intentional infliction of physical injury," Shaw has not cited and the court in conducting its own research has not found, any legal support for this cause of action. In addition, Shaw has alleged no facts to support this purported claim. A moving party with the burden of proof faces a substantially high hurdle. Arnett v. Myers, 281 F.3d 552, 561 (6th Cir. 2002). "Where the moving party has the burden - the plaintiff

on a claim for relief or the defendant on an affirmative defense -
his showing must be sufficient for the court to hold that no
reasonable trier of fact could find other than for the moving
party." Carr v. Booker, No. 12-15074, 2013 WL 409026, at *3 (E.D.
Mich. Feb. 3, 2014) (quoting Calderone v. United States, 799 F2d
254, 259 (6th Cir. 1986)). "The Sixth Circuit has repeatedly
emphasized that the party with the burden of proof 'must show the
record contains evidence satisfying the burden of persuasion and
that the evidence is so powerful that no reasonable juror would be
free to disbelieve it.'" Id. (quoting Arnett, 281 F.3d at 561).
Because Shaw has provided no basis for her "intentional infliction
of physical injury claim," the court concludes that Shaw has not
carried her burden to show that she is entitled to summary judgment
on this claim.

**H.    Labor Management Relations Act of 1947**

Finally, Shaw moves for summary judgment on her claims against
the USPS under § 301 of the Labor Management Relations Act.[24]
Section 301 provides federal district courts jurisdiction over
"[s]uits for violation of contracts between an employer and a labor
organization representing employees in an industry affecting
commerce as defined in this Act, or between any such labor

---

[24]Shaw also cites to the National Labor Relations Act throughout her
filings.  The Labor Management Relations Act of 1947, also known as
the Taft-Hartley Act, was an amendment to the National Labor
Relations Act.

organizations." 29 U.S.C. § 185(a). Employees may bring a suit directly against their employer in limited circumstances:

> [A] union employee has standing to bring a breach of contract claim against his employer only in conjunction with a breach of the duty of fair representation claim against his union. <u>See</u> <u>Aloisi v. Lockheed Martin Energy Sys.</u>, 321 F.3d 551, 558 (6th Cir. 2003) (citing <u>Bacashihua v. United States Postal Serv.</u>, 859 F.2d 402, 405-06 (6th Cir. 1988)). This type of action is referred to as a hybrid Section 301 claim. <u>See</u> <u>id.</u> Although a plaintiff need not sue both his employer and his union, he must prove both the breach of the CBA and the breach of the duty of fair representation. <u>Garrison v. Cassens Transp. Co.</u>, 334 F.3d 528, 538 (6th Cir. 2003) (citing <u>DelCostello v. Teamsters</u>, 462 U.S. 151, 164, 103 S. Ct. 2281, 76 L. Ed.2d 476 (1983)). Unless a plaintiff demonstrates both violations, he cannot succeed against either party. <u>Id.</u> (citing <u>Bagsby v. Lewis Bros. Inc. of Tenn.</u>, 820 F.2d 799, 801 (6th Cir. 1987)).

<u>Brown v. Columbus Bd. of Educ.</u>, 638 F. Supp. 2d 856, 867 (S.D. Ohio 2009); <u>see also</u> <u>DelCostello v. Int'l Bhd. of Teamsters</u>, 462 U.S. 151, 164-165 (1983). "This rule follows from the fact that the union and the employer, and not the individual employee, are usually the only signatories to the [collective bargaining agreement]." <u>Aloisi</u>, 321 F.3d at 558.

Shaw has merely alleged that the union breached its duty of fair representation and that the USPS breached its contract with the union, but has not provided any evidence to support a breach of the collective bargaining agreement or the duty of fair representation. As a result, she has not met her burden to establish that she is entitled judgment as a matter of law on this

claim.  It is recommended that Shaw's Motion for Summary Judgment be denied on this claim.

### III.  RECOMMENDATION

For the above reasons, it is recommended that the USPS's motion be granted and that Shaw's motion be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

February 18, 2014
Date

### NOTICE

**WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS.  ANY PARTY MAY RESPOND TO ANOTHER PARTY'S OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY.  28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(2); L.R. 72.1(g)(2).  FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**